**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>KAISER GYPSUM COMPANY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No: 16-31602 (JCW)<br><br>(Jointly Administered)<br><br>Related Docket No. 1337 |
| KAISER GYPSUM COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ARMSTRONG WORLD INDUSTRIES, INC.,<br><br>Defendant. | Adversary Proceeding No.: 18-03078 |

**DEFENDANT ARMSTRONG WORLD INDUSTRIES, INC.'S
MOTION TO WITHDRAW THE REFERENCE**

Defendant Armstrong World Industries, Inc. ("Armstrong" or "Defendant") moves (the "Motion") to have the United States District Court for the Western District of North Carolina (the "District Court") withdraw the reference of the above-captioned adversary proceeding (the "Adversary Proceeding") (including the Claim Objection (defined below)) to the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"), in accordance with Fed. R. Bankr. P. 5011 and 28 U.S.C. § 157(d).

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanent Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This Adversary Proceeding was filed in connection with the chapter 11 cases jointly administered under In re Kaiser Gypsum Co., Inc., Case No. 16-31602 (JCW) (the "Bankruptcy Cases"). On November 26 2018, Kaiser Gypsum Company, Inc. (the "Plaintiff" or "Kaiser") commenced this action by filing the complaint (the "Complaint"). The Complaint, attached hereto as Exhibit 1, alleges the following causes of action against Armstrong: (1) Cost Recovery under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq. ("CERCLA"); (2) CERCLA Contribution: 42 U.S.C. § 9613(f)(1); (3) CERCLA Contribution: 42 U.S.C. § 9613(f)(3)(B); (4) Cost Recovery: ORS 465.255; (5) Contribution: ORS 465.257; (6) CERCLA Declaratory Judgment: 42 U.S.C. § 9613(g)(2); and (7) Oregon Declaratory Judgment: ORS 28.020. The Oregon state law counts mirror the relief requested under the CERCLA counts and are based on the same operative facts.

The Defendant's deadline to respond to the Complaint is December 27, 2018. Contemporaneously herewith, the Defendant filed a motion to dismiss, seeking dismissal of the second and third counts alleged in the Complaint and partial dismissal of the first count alleged in the Complaint. The motion to dismiss also includes a request to stay the Adversary Proceeding pending the District Court's determination of this Motion.

Concurrently with the filing of the Complaint, the Plaintiff filed an objection (Adv. Docket No. 2) (the "Claim Objection") to the proof of claim filed by Armstrong ("Claim No. 65").[2] In the Complaint, the Plaintiff suggests that the "Complaint is, in effect, a counterclaim to Armstrong's proof of claim . . ." and asserts that it will ask the Court to consolidate the Claim

---

[2] The Claim Objection was also filed in the above-captioned bankruptcy cases (the "Bankruptcy Cases") at Docket No. 1337, and by this Motion, Armstrong seeks withdrawal of the reference with respect to the Claim Objection (as filed in both the Adversary Proceeding and the Bankruptcy Cases). For avoidance of any doubt, all references herein to the "Adversary Proceeding" shall include the Claim Objection.

WBD (US) 45154466v6

Objection and the Complaint.  See Complaint ¶ 29.  To date, the Plaintiff has not moved to consolidate the Claim Objection and the Complaint, nor has the Plaintiff set the Claim Objection for a hearing.  Armstrong agrees that the Complaint and Claim Objection should be considered together. For the reasons set forth herein, the District Court is the court required to hear such matters pursuant to Fed. R. Bankr. P. 5011 and 28 U.S.C. § 157(d).

## SUMMARY OF THE ARGUMENT

The reference to the Bankruptcy Court should be withdrawn, pursuant to 28 U.S.C. § 157(d), for the following reasons:

1. The Adversary Proceeding is subject to mandatory withdrawal of the reference pursuant to 28 U.S.C. § 157(d) because resolution of this proceeding will require the Court's substantial and material consideration of federal environmental statutes (CERCLA).

2. The Adversary Proceeding also is subject to permissive withdrawal of the reference, in order to promote judicial economy.  28 U.S.C. § 157(d).  Specifically, this Adversary Proceeding is a non-core proceeding because the claims seek relief under CERCLA or Oregon state law for contribution, cost recovery, and declaratory relief.  Because these claims are not related to the bankruptcy proceedings, the Bankruptcy Court is without authority to hear and determine these matters on a final basis absent consent of the parties.  Stern v. Marshall, 564 U.S. 462, 483-84 (2011).  Armstrong does not consent to the entry of a final judgment by the Bankruptcy Court. Consequently, judicial economy favors transferring the Adversary Proceeding to the District Court.

## FACTUAL BACKGROUND

### A.    The Property

Until its closure this year, the St. Helens Fiberboard Facility located at 1645 Railroad Avenue in St. Helens, Oregon (the "Property" or the "Site") was used to manufacture a variety of

3

mineral fiber and wood fiber building products, ultimately including ceiling boards and tiles, carpet board, and roof insulation.  From 1956 to 1978, Kaiser owned the Property and manufactured wood and mineral fiber products, including ceiling tile and panels, carpet board, roof insulation, sheathing, and expansion joints, and maintained an asphalt coating operation.  During the entirety of Kaiser's operations, it discharged process wastewater directly into Scappoose Bay.  Owens Corning purchased the Property in August of 1978 and manufactured wood fiber and mineral wool building products through 1981, then ceased all operations and mothballed the plant.  In early 1987, Owens Corning sold the Property and certain assets to Armstrong.

Before it began any operations, Armstrong negotiated to procure wastewater treatment from the City of St. Helens, constructed a treatment system, and eliminated all discharges of process wastewaters to the Bay.  The Oregon Department of Environmental Quality ("DEQ") alleges that over time there have been releases of various contaminants of concern at the Property.  Of particular focus are arsenic and dioxins/furans, which DEQ alleges are found in elevated concentrations at the Property.  DEQ asserts that Kaiser, Owens Corning, and Armstrong may be liable for investigatory and remediation-related costs associated with such releases, including remedial action costs as described in Oregon Revised Statutes (ORS) Chapter 465.

## B.    The DEQ Claim and Armstrong's Proposed Consent Judgment

On September 13, 2017, DEQ filed a proof of claim in the Plaintiff's bankruptcy case in the amount of $150,000,000.00 against Kaiser Gypsum for the remedial investigation, feasibility study, remedial actions, and other related costs that the DEQ allegedly has incurred and in the future will incur due to Kaiser Gypsum's releases of hazardous substances at the Site.

4

Following a mediation in November 2017, Armstrong and Owens Corning each reached bilateral agreements with DEQ to expedite remediation at the Site and resolve their respective liability related to the Site.   Those parties contemplated the filing of consent judgments to effectuate those agreements in Oregon state court.   To facilitate filing of the consent judgments, the DEQ filed in the Bankruptcy Court its *Motion for Confirmation that Automatic Stay Does Not Apply to Applications for Entry of Consent Judgements, or, in the Alternative, Relief from the Automatic Stay for Cause* [Docket No. 984] (the "Stay Relief Motion").

On October 12, 2018, Kaiser objected to the Stay Relief Motion [Docket No. 1000] (the "Stay Relief Objection").   In the Stay Relief Objection, Kaiser argued that effectuating the DEQ settlement could eliminate contribution rights and increase Kaiser's potential liability to the DEQ.

On September 6, 2018, the Bankruptcy Court granted the Stay Relief Motion [Docket No. 1140] (the "Stay Relief Order") and overruled Kaiser's objection.   However, the Stay Relief Order has been appealed by Kaiser (the "Appeal") to the District Court. *See* <u>Kaiser Gypsum Co., Inc. et al v. Oregon Dept. of Environ. Quality</u>, Case No. 3:18-cv-00507-GCM (W.D.N.C.).   The District Court has stayed the effectiveness of the Stay Relief Order for the duration of the Appeal [Appeal Docket No. 7].   The parties have agreed that the Appeal should be adjudicated prior to April 2019.   However, recently Kaiser has apprised the Bankruptcy Court that it has a settlement in principle with the DEQ, and has agreed with the DEQ to postpone briefing in the Appeal.

**C.      The Complaint and Claim No. 65**

On September 12, 2017, Armstrong filed Claim No. 65.   Claim No. 65 asserts an unliquidated claim related to alleged environmental liabilities associated with the Site. Specifically, Claim No. 65 is based on, among other things, (a) a pre-petition agreement, as

5

amended, by and between Armstrong and Kaiser entered into on or about July 2003 whereby costs of the environmental investigation at the Site was preliminarily divided between Armstrong and Kaiser; (b) the Order on Consent Requiring Remedial Investigation and Feasibility Study agreed to by Armstrong, Kaiser, Owens Corning, and the DEQ effective as of August 23, 2010; (c) the In-Water Remedial Investigation/Feasibility Study and Remedy Selection and Implementation dated April 1, 2010 between Armstrong, Kaiser, and Owens Corning; (d) applicable statutory and regulatory law; and (e) applicable common law.

On November 26, 2018, the Plaintiff filed the Complaint.  The Complaint asserts that (i) Armstrong is jointly and severally liable for response costs incurred or to be incurred by the Plaintiff as a result of releases, threatened releases, and/or disposal of hazardous substances at or from the Site, Complaint ¶ 48, (ii) the Plaintiff is entitled to contribution from Armstrong for Armstrong's share of response costs that the Plaintiff has or will incur as a result of the release, threatened release, and/or disposal of hazardous substances at and from the Site, Complaint ¶¶ 53, 58, 73; (iii) Armstrong is strictly liable to the Plaintiff for remedial action costs attributed to or associated with releases, threatened releases, and/or disposal of hazardous substances at or from the Site, Complaint ¶ 68; and (iv) the Plaintiff is entitled to declaratory judgment finding Armstrong a liable party that must contribute its share of future response costs at the Site, including its share of the DEQ's claim, Complaint  ¶¶ 79, 85.

## ARGUMENT AND AUTHORITIES

Withdrawal of the reference of a dispute to a bankruptcy court is mandatory if the dispute requires application of federal statutes.  Specifically, 28 U.S.C. § 157(d) states:  "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d)

6

(emphasis added).  As set forth _infra_ in Part I, the adjudication of the dispute between Kaiser and Armstrong, which centers on CERCLA, requires consideration of federal laws.  Therefore, this dispute falls squarely within the scope of the statute mandating the District Court to withdraw the reference.

Even if withdrawal of the reference were not required by the statute, nonetheless the District Court should withdraw the reference as a discretionary matter.  Separate from mandating withdrawal of the reference in certain circumstances, 28 U.S.C. § 157(d) also provides the court with discretion to withdraw the reference of any dispute to the Bankruptcy Court.  In particular, that section states:  "The district court may withdraw, in whole or in part, _any case or proceeding_ referred [to the bankruptcy court] on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d) (emphasis added).  While "cause" is not defined, as explained _infra_ in Part II, among the factors that courts consider are whether the proceeding is core or non-core, the uniform administration of the bankruptcy proceedings, and promoting judicial economy.  Here, the factors compellingly weigh in favor of the reference of the dispute to the Bankruptcy Court being withdrawn as a matter of discretion.  See _infra_ Part II.

For each of these reasons, the court should withdraw the reference of the Adversary Proceeding to the Bankruptcy Court, in order to allow the District Court to adjudicate them on a final basis.

## I.     THE ADVERSARY PROCEEDING AND THE CLAIM OBJECTION ARE SUBJECT TO MANDATORY WITHDRAWAL OF THE REFERENCE

The Adversary Proceeding and the Claim Objection is subject to mandatory withdrawal of the reference pursuant to 28 U.S.C. § 157(d) because resolution of this proceeding will require the Court's substantial and material consideration of federal environmental statutes in

7

determining whether to impose the contribution and recovery sought by Plaintiff and to issue a declaratory judgment under CERCLA.

By way of background, district courts have "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). However, a district court may "refer[] to the bankruptcy judges for the district" any or all bankruptcy cases. 28 U.S.C. § 157(a). All bankruptcy cases in this district are referred to the bankruptcy courts in this district. See Amended Standing Order of Reference, dated April 14, 2014. Although Congress provided a mechanism for district courts to refer cases to bankruptcy courts, Congress also provided the mechanism for district courts to withdraw that reference and re-assert its jurisdiction. In certain circumstances, namely, if the dispute involves consideration of non-bankruptcy federal laws, withdrawal of the reference is mandatory. Specifically, 28 U.S.C. § 157(d) states: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (emphasis added). In all other disputes, the court may, in its discretion, withdraw the reference. Specifically, 28 U.S.C. § 157(d) further states: "The district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d) (emphasis added). The two sentences of section 157(d) are read separately, and are generally referred to as, respectively, the "mandatory" and "permissive" withdrawal provisions.[3]

Here, the resolution of the Adversary Proceeding and Claim Objection necessarily will require substantial interpretation of CERCLA and/or other environmental laws and their

---

[3]    Bankruptcy Rule 5011(a) further provides that "[a] motion for withdrawal of a case or proceeding shall be heard by a district judge." Fed. R. Bankr. P. 5011(a).

8

interplay with the Bankruptcy Code, making withdrawal of the reference mandatory.  The issues presented in the Complaint require interpretation of the construction of CERCLA and a determination and allocation of liability and the Claim Objection will likewise require interpretation of environmental laws, including Oregon environmental laws, that involve overlapping and, in some instances, coextensive findings. These issues dominate the Adversary Proceeding and Claim Objection.

The mandatory withdrawal provision specifies that a "district court shall . . . withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d).  The purpose of the mandatory withdrawal provision is "to assure that an Article III judge decides issues calling for more than routine application of statutes outside the Bankruptcy Code." In re Horizon Air, 156 B.R. 369, 373 (N.D.N.Y. 1993) (citing E. Airlines, Inc. v. Air Line Pilots Assoc. (In re  Ionosphere Clubs, Inc.), No. 89 Civ. 8250 (MBM), 1990 WL 5203, at *5 (S.D.N.Y, Jan. 24, 1990)).

The Court of Appeals for the Fourth Circuit has not yet interpreted 28 U.S.C. § 157(d)'s "requires consideration of" language and there are differing views with respect to its interpretation.  The minority view is a "liberal, statutory approach," holding mandatory withdrawal applicable if there is a non-Title 11 federal question presented that will affect the outcome of the proceeding. Contemporary Lithographers, Inc. v. Hibbert (In re Contemporary Lithographers, Inc.), 127 B.R. 122, 127-28 (M.D.N.C. 1994).  The majority view holds that mandatory withdrawal is only required when a proceeding requires a "substantial and material" consideration of non-bankruptcy federal law. Eli Global, LLC v. Univ. Directories, LLC, 532 B.R. 249. 251-52 (M.D.N.C. 2015).  The mandatory withdrawal provision of section 157(d)

9

requires withdrawal of the reference whenever a proceeding pending in bankruptcy court involves anything more than the routine application of non-bankruptcy laws. Keene Corp. v. Williams Bailey & Wesner, LLP (In re Keene Corp.), 182 B.R.. 379, 382 (S.D.N.Y. 1995) (withdrawal of the reference "warranted when resolution of the matter would require the bankruptcy judge to 'engage in significant interpretation, as opposed to simple application,' of federal non-bankruptcy statutes" (quoting City of N.Y. v. Exxon Corp., 932 F.2d 1020, 1026 (2d. 1991))).

"Withdrawal of the reference may also be mandated where 'issues arising under non-title 11 laws dominate those arising under title 11, . . .'" Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.), Nos. 07 Civ. 10527 (SAS), 07 Civ. 10530 (SAS), 2008 WL 649770, at *4 (S,D.N,Y. Mar. 10, 2008) (ellipsis in original) (quoting In re Texaco Inc., 84 B.R. 911, 921 (S.D.N.Y. 1988)). "In such cases, a district court does not have discretion to deny a petition for withdrawal." Am. Tel. & Tel, Co. v. Chateaugay Corp., 88 B.R. 581, 584 (S.D.N.Y. 1988).

Courts applying these standards routinely withdraw the reference in cases that implicate substantial questions of environmental law. See, e.g., In re Dana Corp., 379 B,R. 449, 456-61 (S.D.N.Y. 2007) (withdrawing the reference with respect to objection to, and estimation of, EPA claim raising numerous issues under CERCLA including joint and several liability and equitable allocation); U.S. v. Johns-Manville Corp. (In re  Johns-Manville Corp.), 63 B.R. 600, 602 (S.D.N.Y. 1996) (withdrawing the reference to resolve whether post-petition CERCLA claim was covered by automatic stay); Am. Tel. & Tel., 88 B.R. at 587-88 (withdrawing the reference to determine, among other things, whether right of contribution under section 113 of CERCLA was "claim" within meaning of Bankruptcy Code); In re Combustion Equip. Assocs., 67 B.R. 709, 713 (S.D.N.Y. 1986) (withdrawing the reference with respect to issue of whether post-

WBD (US) 45154466v6

bankruptcy CERCLA claim was discharged); see also In re Nat'l Gypsum Co., 134 B.R. 188, 192 (N.D. Tex. 1991) (noting that CERCLA is "precisely 'the type of law . . . Congress had in mind when it enacted the statutory withdrawal provision'" (quoting U.S. v. ILCO, 48 B.R. 1016 (N.D. Ala. 1985))); U.S. v. Delfasco, Inc., 409 B.R. 704, 705 (D. Del. 2009) (withdrawing the reference where United States sought, inter alia, to enforce prepetition remediation order under RCRA). These cases also confirm the readily apparent proposition that the federal environmental laws, including CERCLA, are non-bankruptcy "laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). See, e.g., Freier v. Westinghouse Elec. Corp., 303 F.3d 176, 202 (2d Cir. 2002) (generation and disposal of waste as regulated under CERCLA is economic business activity that substantially affects interstate commerce); Dana, 379 B.R. at 455 ("It is undisputed that CERCLA is a federal statute that regulates organizations or activities affecting interstate commerce.").

Pursuant to the standards established by section 157(d), withdrawal of the reference of the Adversary Proceeding is required regardless of whether the minority or majority approach is applied. Even under a strict interpretation of the "requires consideration of" language in section 157(d), resolution of the Adversary Proceeding requires a "substantial and material" consideration of non-bankruptcy federal law. Specifically, the proceeding presents substantial questions requiring significant interpretation of CERCLA and corollary state statutes.[4]  Indeed, the CERCLA and corresponding Oregon state environmental laws dominate any issues arising

---

[4]    The state statutes that underpin the Plaintiff's claims are similar to CERCLA. Accordingly, principles of uniformity, judicial economy and efficiency dictate that the entire adversary proceeding should proceed before the District Court.  See In re Orion Pictures Corp., 4 F.3d 1095, 1100 (2d Cir. 1993) (in deciding whether to permissibly withdraw the reference for "cause," courts should consider whether principles of, inter alia, efficiency and uniformity in the administration of the bankruptcy law would be served by withdrawal).  See also Contemporary Lithographers, 127 B.R. at 128 (exercising discretionary power to withdraw lawsuit to collect debt that was related to a different lawsuit that was being withdrawn pursuant to the mandatory provisions of 28 U.S.C. § 157(d) because it was in the interest of the courts to try all claims arising from the same transaction together).

WBD (US) 45154466v6

under Title 11 (if any).  Resolution of the Complaint and the Claim Objection will require resolution of, among other issues, (1) a determination of whether there have been releases, threatened releases, or disposal of hazardous substances at the Site, (2) who is responsible for those releases, and (3) the allocation of liability of the parties.  All of these require substantial consideration of CERCLA and corresponding Oregon state environmental law. Therefore, section 157(d) requires that the reference of the Adversary Proceeding to the Bankruptcy Court must be withdrawn.

## II.    THE COURT SHOULD WITHDRAW THE REFERENCE AS A MATTER OF DISCRETION

Mandatory withdrawal is required in this case, as explained above; however, withdrawal is also appropriate in the Court's discretion, for cause.

Section 157(d) provides, in relevant part, that the "district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d).  Although section 157(d) does not define "cause," courts in this district have held that district courts should weigh the following factors when determining whether cause exists to withdraw the reference as a matter of discretion: (1) whether the proceeding is core or non-core; (2) the uniform administration of the bankruptcy proceedings; (3) expediting the bankruptcy process and promoting judicial economy; (4) the efficient use of debtors' and creditors' resources; (5) the reduction of forum shopping; and (6) the preservation of the right to a jury trial.  Blue Cross & Blue Shield of N.C., 506 B.R. at 697; Finley Grp. v. 222 S. Church St., LLC, No. 3:15-CV-00029-FDW, 2015 WL 996631, at *3 (W.D.N.C. Mar. 6, 2015).  Not all factors need to be satisfied to grant permissive withdrawal and the decision should be "determined on a case-by-case basis by weighing all the factors."  In re U.S. Airways Grp., Inc., 296 B.R. 673, 682 (E.D. Va. 2003).

12

Applied here, the factors support permissive withdrawal of the reference.

*First*, this Adversary Proceeding is not a core proceeding.  It is not included within the list of the types of proceedings that are core, as set forth in 28 U.S.C. § 157(b).  And while that list is not exhaustive, courts have explained that core proceedings include "[c]laims that clearly invoke substantive rights created by federal bankruptcy law [that] necessarily arise under Title 11" as well as "proceedings that, by their nature, could arise only in the context of a bankruptcy case."  MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 108-09 (2d Cir. 2006).  The crux of this proceeding stems from an interpretation of the environmental laws that would exist independently of the Bankruptcy Code.  Thus, these issues are not of the type that "could arise only in the context of a bankruptcy case."  Id. at 109.[5]

*Second*, even if determined to be core matters under 28 U.S.C. § 157(b)(2), the Bankruptcy Court lacks the constitutional authority to issue final judgments in this dispute.  In Stern, 564 U.S. at 483-84, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final judgment on the bankruptcy estate's state law counterclaim against a defendant who had filed a proof of claim against the estate, even though the counterclaim was, under 28 U.S.C. § 157(b)(2)(C), a core proceeding.  In response to Stern, this Court characterized the relevant inquiry with respect to withdrawing the reference not as whether the claims are core or non-core, but whether the bankruptcy court has authority to enter a final judgment over the claims.  Blue Cross & Blue Shield of N.C., 506 B.R. at 698  ("[A]fter

---

[5]    The Plaintiff has asserted that the Complaint is akin to a counterclaim to Claim No. 65.  Section 157(b)(2) includes an "allowance or disallowance of claims against the estate" and "counterclaims by the estate against persons filing claims against the estate" as core proceedings. 28 U.S.C. §§ 157(b)(2)(B), 157(b)(2)(C). In this proceeding, however, the key question is not an evaluation of the disallowance of a particular "claim" or "debt" (defined in the Bankruptcy Code as "liability on a claim," 11 U.S.C. § 101(12)) or the validity of a counterclaim, but rather an evaluation of environmental statutes to determine contribution and recovery.  Moreover, as noted herein even if 28 U.S.C. 157(b)(2) designates a matter as core, the Bankruptcy Court may still lack constitutional authority to issue final judgments on the dispute.  See Stern, 564 U.S. at 483-84.

13

Stern, one can still [consider the applicable factors] but not looking at whether the matter can be classified as 'core' under 28 U.S.C. § 157, but rather at whether, under Stern, the [b]ankruptcy [c]ourt has the final power to adjudicate it.").

*Third*, in this case, permissive withdrawal would also be an appropriate and efficient use of judicial resources, for two reasons. As an initial matter, the district courts have expertise in handling complex environmental statutes such as CERCLA and state environmental statutes. In light of the similarity of state environmental laws to the federal environmental laws at issue and the substantially overlapping factual matters, principles of uniformity, judicial economy, and efficiency warrant permissive withdrawal. See Orion Pictures Corp., 4 F.3d at 1100. Additionally, even if the Bankruptcy Court were to hear the Adversary Proceeding in the first instance, because it is unable to enter a final order under Stern, the dispute would ultimately end up before the District Court and thereby consume two courts' time and resources in order for a final order to be entered. There is no efficiency in having the Bankruptcy Court propose resolution of questions of environmental law in the first instance on a non-final basis, only to be finally adjudicated by the District Court. (Furthermore, even if this lawsuit raised a "core" issue (which it does not), such that the Bankruptcy Court could enter final orders, any such decision would be appealable as a matter of right to the District Court, 28 U.S.C. § 157(c)(1), which reviews a bankruptcy court's legal findings de novo. See Shugrue v. Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 988-89 (2d Cir. 1990). In light of the complexity and importance of the matters at issue here, an appeal of a Bankruptcy Court ruling to the District Court would be highly likely. For that reason as well, judicial economy is best served by having the District Court adjudicate the Adversary Proceeding in the first instance. Thus, withdrawal of

14

the reference would minimize duplicative review and promote the efficient use of judicial resources.

*Fourth*, resolution of these matters in the District Court would not unduly delay the proceedings.  The District Court is familiar with the parties and the background of the dispute between the Plaintiff and Armstrong by virtue of the Appeal.  The District Court can impose an appropriate briefing and discovery schedule to resolve the environmental issues that would take into account the time requirements of the bankruptcy proceedings.  Accordingly, permissive withdrawal will not impose unnecessary cost and delay on the parties.

Moreover, withdrawal of the reference will not hinder uniformity in bankruptcy administration.  Armstrong seeks to withdraw the reference solely with respect to the matters alleged in the Adversary Proceeding, including the Claim Objection.  This "limited withdrawal of the reference as to this single issue pose[s] no threat to the uniformity of the administration of the estate." In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir. 1996).

*Fifth* and finally, Armstrong is not forum shopping.  It has timely moved for withdrawal before the Bankruptcy Court has taken any substantive actions in this Adversary Proceeding. Accordingly, the permissive withdrawal factors favor withdrawal of the reference as a matter of the Court's discretion.

## CONCLUSION

For the foregoing reasons, Armstrong respectfully requests that the District Court withdraw the reference to the Bankruptcy Court of this Adversary Proceeding and grant Armstrong such further relief as is just and proper.

WBD (US) 45154466v6

Dated: December 27, 2018

Respectfully submitted,

/s/ Christopher M. Towery
Christopher M. Towery
North Carolina State Bar No. 48235
Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston Salem, NC 27101
Phone:  (336) 747-6640
Email: chris.towery@wbd-us.com

and

Matthew P. Ward (Del. Bar No. 4471)
(*pro hac vice motion forthcoming*)
Ericka F. Johnson (Del. Bar No. 5024)
(*pro hac vice motion forthcoming*)
Morgan L. Patterson (Del. Bar No. 5388)
(*pro hac vice motion forthcoming*)
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Email:  matthew.ward@wbd-us.com
Email:  ericka.johnson@wbd-us.com
Email:  morgan.patterson@wbd-us.com

*Counsel for Armstrong World Industries, Inc.*

16

# EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | Case No. 16-31602 (JCW) |
| Debtors. | (Jointly Administered) |
| KAISER GYPSUM COMPANY, INC., Plaintiff, v. ARMSTRONG WORLD INDUSTRIES, INC., Defendant. | Adv. Pro. No. 18-_____ (____) |

### COMPLAINT OF KAISER GYPSUM COMPANY, INC.
### FOR MONEY DAMAGES AND DECLARATORY RELIEF

Plaintiff Kaiser Gypsum Company, Inc. ("Kaiser"), for its Complaint against

Defendant Armstrong World Industries, Inc. ("Armstrong"), alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for cost recovery and/or contribution from Armstrong

pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42

U.S.C. §§ 9601 et seq. ("CERCLA"), and the Oregon Cleanup Law, ORS 465.200 et seq., and

for declaratory judgment in connection with environmental response, removal, cleanup and

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

remedial action costs incurred by Kaiser and for which Kaiser is alleged to be liable as a result of discharges, releases or threatened releases or disposal of hazardous substances at the St. Helens Fiberboard Facility located at 1645 Railroad Avenue in St. Helens, Oregon (the "Site").

## THE PARTIES

2.      Kaiser is a corporation organized under the laws of the state of North Carolina, with its principal place of business in Texas.

3.      Armstrong is a corporation organized under the laws of the state of Pennsylvania, with its principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C) and (O).  Declaratory relief is authorized by 28 U.S.C. § 2201.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

6.      Kaiser will provide a copy of this Complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency ("EPA") as required by 42 U.S.C. § 9613(l).

## FACTS COMMON TO ALL CLAIMS

### History of Ownership and Operations

7.      The Site consists of approximately 175 acres with approximately 38 acres identified as the "uplands," which have been developed and used for manufacturing operations since 1930.  The remainder of the Site consists of an undeveloped area identified as the "lowlands" that includes submerged land, tide lands, wetlands, and seasonally inundated lands.

Scappoose Bay borders the Site on the south and southeast, Milton Creek follows the eastern boundary of the Site, McNulty Creek follows the western side of the Site and Old Portland Road and Railroad Ave form the northwestern and northeastern Site boundaries, respectively.

8.  Fir-Tex Insulation Board Company ("Fir-Tex") built a fiberboard plant at the Site in 1930 and operated it for over 26 years. Fir-Tex produced sheet and fiberboard products. Fir-Tex no longer exists and thus its liability at the Site constitutes an "orphan share."

9.  Kaiser purchased the property and certain assets of Fir-Tex in 1956. For just under 22 years, from November 1956 until August 1978, Kaiser owned and operated the fiberboard plant and produced sheet products from wood fiber and mineral fiber.

10.  Owens–Corning Fiberglas Corporation ("Owens Corning") purchased the plant and property from Kaiser in 1978. Owens Corning operated the plant for just over 3 years, during which time the plant manufactured wood fiber and mineral fiber sheet products. Owens Corning closed the plant in late 1981 or early 1982.

11.  Armstrong purchased the Site from Owens Corning in 1987, acquired title to the land pursuant to a Special Warranty Deed dated February 12, 1987 and began operations in early 1990 following renovation of the plant. The purchase agreement between Owens Corning and Armstrong specifically provided Armstrong with purchase price reductions for environmental cleanup at the Site. Armstrong continues to own the Site today, and operated it for over 28 years until it ceased operations earlier this year.

**Environmental Conditions and Liability at the Site**

12.     In 1984, the United States Environmental Protection Agency ("USEPA"), through its contractor Ecology and Environment, Inc. ("E&E"), conducted an assessment of the Site and issued a "Preliminary Site Inspection Report."  This Preliminary Site Inspection Report identified the presence of hazardous substances in Site effluent, lagoon sludge and holding pond sludge, including the presence of pentachlorophenol and arsenic.

13.     Prior to its acquisition of the Site from Owens Corning, Armstrong hired CH2M Hill to conduct an environmental survey of the Site.

14.     CH2M Hill issued an Environmental Survey dated January 29, 1987 that: (i) stated that CH2M Hill had reviewed the DEQ's files on the Site; and (ii) identified several environmental conditions at the Site, stating, by way of example, the following:

   a.  "wood fiber, reject fiberboard, sawdust, and miscellaneous plant debris have either been disposed of onsite or remain in open storage"

   b.  "A significant portion of the area between the Quonset hut and the naptha tank (see photograph 11) was covered with asphalt-naptha like material.  The surface of this material was dry; however, below the surface the material was sticky.  When standing in this area, one can smell asphalt/naptha-type odor, which are likely coming from the spilled material and approximately 2 feet of material remaining in the naptha tank.  In addition, there is asphalt/naptha and asphalt/naptha/wood fiber material dumped along and over the embankment north-northeast of the Quonset hut across from the access road previously used by contractors."

   c.  "The surface spills and disposal of asphalt/naptha-type materials at several locations on the plant-site should be removed.  Under current solid and hazardous waste regulations, these spills would likely have been required to be reported to the DEQ.  In the future, should Armstrong wish to make site improvements requiring cleanup of these areas and disposal of these materials, there likely could be additional disposal costs because of the nature of the spilled material."

15.     The Oregon Department of Environmental Quality ("DEQ") has determined that hazardous substances were released from the Site.

-4-

16.     On October 9, 2001, the DEQ issued an Order Requiring Remedial Investigation, Feasibility Study, Design, and Remedial Action (the "2001 Order") directing Armstrong to complete a remedial investigation and feasibility study ("RI/FS") and to take any remedial actions necessary with respect to the Site.  The DEQ then notified Kaiser and Owens Corning that they were both considered potentially responsible parties ("PRPs") under applicable state law.  Armstrong, Kaiser, and Owens Corning (collectively, "the PRPs") are the only remaining PRPs in existence with respect to the Site.

17.     In October 2000, Owens Corning filed a chapter 11 case, *In re Owens Corning, et al*, Case No. 00-03837, in the United States Bankruptcy Court for the District of Delaware.  In December 2002, during the pendency of the chapter 11 case, Owens Corning entered into a stipulation and consent decree that memorialized a partial settlement with the DEQ regarding the Site, but specifically excluded from that settlement was any liability associated with "the sediments of Scappoose Bay that lie continuously below the low water line of the Columbia River."

18.     In December 2000, Armstrong filed a chapter 11 case, *In re Armstrong World Industries, Inc., et al*, Case No. 00-4471, in the United States Bankruptcy Court for the District of Delaware.

19.     On January 6, 2003, during the pendency of its chapter 11 case, Armstrong filed suit, captioned *Armstrong World Industries, Inc. v. Kaiser Gypsum Company, Inc., et al.* (the "Armstrong Litigation"), against Kaiser and an affiliate in federal district court in Oregon asserting, among other causes of action, cost recovery under CERCLA Section 107(a),

42 U.S.C. § 9607(a), and contribution under CERCLA Section 113(f), 42 U.S.C. § 9613(b), with respect to alleged environmental contamination at the Site.

20.   Armstrong and Kaiser eventually executed an Interim Cost Share Agreement that, among other things, allocated responsibility for payment of response costs and remedial action costs on an interim basis, subject to reallocation at some time in the future.  The parties subsequently amended that agreement.  Armstrong and Kaiser also executed a Tolling Agreement that, among other things, tolled during the duration of the interim cost sharing agreement the running of the statute of limitations as between the parties on any claims of any kind that were or could have been asserted in the Armstrong Litigation.  In August 2003, the Armstrong Litigation was dismissed without prejudice.

21.   On August 18, 2006, the United States District Court for the District of Delaware entered an order confirming a plan of reorganization for Armstrong (the "Armstrong Plan"), which became effective on October 2, 2006.  The Armstrong Plan did not discharge Armstrong's liability for contamination at the Site, which Armstrong continued to own and operate during and for years following its chapter 11 case.

22.   Armstrong itself acknowledged that the Armstrong Plan did not discharge Armstrong's liability at the Site in its March 30, 2007 Form 10 K report for the period ending December 31, 2006, which stated as follows:

> "Certain of AWI's environmental liabilities were discharged through its Chapter 11 Case while others were not.  Those environmental obligations that AWI has with respect to property that it owns or operates or for which a non-debtor subsidiary is liable were unaffected by the Chapter 11 Case.  Therefore, AWI and its subsidiaries will be required to continue meeting their ongoing environmental compliance obligations at such properties."

> "[E]nvironmental claims AWI has with respect to property that it

currently owns or operates, have not been discharged. Therefore, we will be required to continue meeting our on-going environmental compliance obligations at those sites."

23.     In 2007, the DEQ notified the PRPs that certain additional property near the St. Helens plant required remedial investigation. On February 6, 2008, Kaiser entered into a voluntary agreement (the "2008 Voluntary Agreement") with the DEQ requiring the performance of an in-water remedial investigation. Neither Armstrong nor Owens Corning were parties to the 2008 Voluntary Agreement. In March 2008, Armstrong, Owens Corning, and Kaiser entered into an agreement to fund, on an interim basis, the in-water remedial investigation required by the 2008 Voluntary Agreement.

24.     Effective August 23, 2010, Armstrong, Owens Corning, and Kaiser entered into an Order on Consent Requiring Remedial Investigation and Feasibility Study (DEQ No. LQSR-NWR-10-05) (the "Consent Order"), pursuant to which the PRPs are required to complete a full remedial investigation and feasibility study at the Site.

25.     In 2013 and 2014, the PRPs submitted remedial investigation and risk assessment reports to the DEQ pursuant to the Consent Order. The DEQ provided comments on these reports in March 2015 and clarified its comments in January 2016.

26.     In 2016, the PRPs submitted a feasibility study for the upland portion of the Site. In June 2018, the DEQ issued a Record of Decision selecting a remedial action to be implemented for the upland portion of the Site at an estimated cost of approximately $1.44 million. To date, no feasibility study has been completed for the lowland and in-water portions of the Site, and the DEQ has not issued either a draft or final selection of remedy for those portions of the Site.

27.     Kaiser has incurred in excess of $6 million performing the above-described response activities at the Site, and will continue to incur response costs and remedial action costs to address the release, threatened release or disposal of hazardous substances at the Site.

### Kaiser Bankruptcy Proceeding, Armstrong's Claim, and the DEQ Claim

28.     On September 30, 2016, Kaiser filed a chapter 11 case, *In re Kaiser Gypsum Company, Inc., et al*, Case No. 16-31602 (JCW) in the United States Bankruptcy Court for the Western District of North Carolina, Charlotte Division (the "Bankruptcy Case"), which remains pending.

29.     On September 12, 2017, Armstrong filed a proof of claim (Bankruptcy Case Proof of Claim No. 65) in an unliquidated amount, asserting that Kaiser is responsible for complete reimbursement (i.e., that Armstrong would have a 0% share of liability at the Site) of: (a) $3,959,798.16 in pre-petition investigation, cleanup, remediation, response and remedial action costs allegedly incurred by Armstrong at the Site; (b) $204,303.38 in post-petition investigation, cleanup, remediation, response and remedial action costs alleged incurred by Armstrong at the Site; and (c) undetermined future investigation, cleanup, remediation, response and remedial action costs relating to the Site that have not yet been incurred by Armstrong. Contemporaneous with the filing of this Complaint, Kaiser is filing an objection to Armstrong's proof of claim.  Because this Complaint is, in effect, a counterclaim to Armstrong's proof of claim, Kaiser will ask the Court to consolidate the claim objection and the Complaint so that both matters, which arise from the same operative facts, can be heard together.

30.     On September 13, 2017, the DEQ filed a proof of claim (Bankruptcy Case Proof of Claim No. 70), asserting that Kaiser is liable for estimated costs of up to $150 million to remediate contamination at the Site.  Kaiser filed an objection to DEQ's proof of claim on October 12, 2018.  Since the filing of the objection, Kaiser and DEQ have reached an agreement in principle to resolve DEQ's claim.

## Proposed Settlement between the DEQ and Armstrong

31.     During the pendency of the Bankruptcy Case, Kaiser has participated in multiple mediation sessions intended to globally resolve the liability of each of the PRPs regarding the Site.  During an initial mediation session in November 2017, the DEQ reached settlements in principal with Armstrong and Owens.

32.     The DEQ proposes to settle with Armstrong for only $10 million, which is less than 7 percent of the $150 million that the DEQ alleged is the potential cost to remedy the Site.

33.     In February 2018, the DEQ gave public notice of the proposed consent judgments with Armstrong and Owens.  In March 2018, Kaiser objected to the settlements on several grounds, primarily that Armstrong's equitable share of the liability at the Site should be much greater and that the proposed settlement has the effect of imposing a disproportionate and significantly higher liability share on Kaiser than is justified by equitable allocation principles.

## Armstrong is Liable for Contamination at the Site

34.     Armstrong has owned the property for over 30 years and operated the plant at the Site for over 28 years.

35.     Armstrong used as a raw material in its manufacturing operations at the Site a ball clay that contains significant levels of dioxins and furans, which are key contaminants of concern ("COC") at the Site.

36.     Armstrong has a documented history of numerous releases and spills at the Site, in both the Site uplands and in the Site lowlands, and both before and after Armstrong's bankruptcy.  Armstrong's own records show that sampling in certain areas of such releases and spills has documented the presence of hazardous substances at concentrations exceeding background sampling.

37.     As recently as 2014, there were measurable concentrations of COCs associated with Armstrong's ongoing Site operations present in storm water sampled at the Site.

38.     Contamination and the release of hazardous substances by Armstrong has continued at the Site during most if not all of Armstrong's period of ownership and operations at the Site.

39.     Under the equitable allocation principles governing contribution, as provided in 42 U.S.C. §9613(f) and ORS 465.257, Armstrong should be allocated a larger share of the cleanup costs at the Site than Kaiser.  Armstrong owned the Site for 31 of the 79 years it was in operation, which equates to over 39 percent of the years of operation at the Site.  Kaiser owned the Site for only 22 years, which was only 28 percent of the years of Site operation.  In addition, Armstrong should be allocated an appropriate percentage of the orphan share attributable to Fir-Tex's operations at the Site.

## FIRST CLAIM FOR RELIEF

### (CERCLA Cost Recovery: 42 U.S.C. §9607(a))

40.     Kaiser realleges and incorporates by reference the allegations in
paragraphs 1 through 40 of this Complaint, as if fully set forth herein.

41.     The Site is a "facility" as defined by 42 U.S.C. § 9601(9).

42.     Armstrong is a "person" as defined by 42 U.S.C. § 9601(21).

43.     There have been releases, threatened releases or disposal of hazardous
substances at or from the Site, within the meaning of 42 U.S.C. § 9601(14), § 9601(22) and §
9607(a).

44.     Armstrong was an "owner" and/or an "operator" of the Site at a time when
hazardous substances were released, were threatened to be released or were disposed at the
facility, within the meaning of 42 U.S.C. § 9607(a)(2).

45.     Armstrong is the current "owner" and the current "operator" of the Site
within the meaning of 42 U.S.C. § 9607(a)(1).

46.     Such releases, threatened releases or disposal of hazardous substances at
or from the Site have caused and will continue to cause Kaiser to incur necessary response costs
within the meaning of 42 U.S.C. § 9607(a).

47.     The response costs Kaiser has incurred and will continue to incur at the
Site are necessary and consistent with the National Contingency Plan.

48.     Pursuant to 42 U.S.C. § 9607(a), Armstrong is jointly and severally liable
for response costs incurred or to be incurred by Kaiser as a result of releases, threatened releases
and/or disposal of hazardous substances at or from the Site, excepting only those costs

recoverable pursuant to the contribution claims set out in the second and third causes of action
below.

## SECOND CLAIM FOR RELIEF

### (CERCLA Contribution:  42 U.S.C. §9613(f)(1))

49.     Kaiser realleges and incorporates by reference the allegations in
paragraphs 1 through 49 of this Complaint, as if fully set forth herein.

50.     Releases, threatened releases and/or disposal of hazardous substances at or
from the Site caused Kaiser to incur response costs.

51.     The Armstrong Litigation filed in 2003 was a "civil action" under
CERCLA Section 107(a) within the meaning of 42 U.S.C. § 9613(f)(1).

52.     The response costs Kaiser has incurred and will continue to incur at the
Site are necessary and consistent with the National Contingency Plan.

53.     Pursuant to 42 U.S.C. §9613(f)(1), Kaiser is entitled to contribution from
Armstrong for Armstrong's equitable share of response costs  that Kaiser has incurred or will
incur as the result of the release, threatened release and/or disposal of hazardous substances at
and from the Site.

## THIRD CLAIM FOR RELIEF

### (CERCLA Contribution:  42 U.S.C. §9613(f)(3)(B))

54.     Kaiser realleges and incorporates by reference the allegations in
paragraphs 1 through 54 of this Complaint, as if fully set forth herein.

55.     Releases, threatened releases and/or disposal of hazardous substances at or
from the Site caused Kaiser to incur response costs.

56.     Through the 2008 Voluntary Agreement and/or the Consent Order, Kaiser has resolved its liability to the State of Oregon for some of a response action and/or for some of the costs of such action in an administrative settlement within the meaning of 42 U.S.C. § 9613(f)(3)(B).

57.     The response costs Kaiser has incurred and will continue to incur at the Site are necessary and consistent with the National Contingency Plan.

58.     Pursuant to 42 U.S.C. §9613(f)(3)(B), Kaiser is entitled to contribution from Armstrong for Armstrong's equitable share of response costs that Kaiser has incurred or will incur as the result of the release, threatened release and/or disposal of hazardous substances at and from the Site.

### FOURTH CLAIM FOR RELIEF

### (Cost Recovery:  ORS 465.255)

59.     Kaiser realleges and incorporates by reference the allegations in paragraphs 1 through 59 of this Complaint, as if fully set forth herein.

60.     The Site is a "facility" as defined by ORS 465.200(13).

61.     Armstrong is a "person" as defined by ORS 465.200(21).

62.     There have been releases, threatened releases or disposal of hazardous substances at or from the Site, within the meaning of ORS 465.200(16), ORS 465.200(22) and ORS 465.255.

63.     Armstrong was an "owner" and/or an "operator" of the Site at or during the time of acts or omissions that resulted in the release of hazardous substances at the facility, within the meaning of ORS 465.255(1)(a).

64.     Armstrong was also an "owner" and/or an "operator" of the Site after the time of other acts or omissions that resulted in the release of hazardous substances at the facility, and Armstrong knew or reasonably should have known of such release when it first became the owner or operator of the facility within the meaning of ORS 465.255(1)(b).

65.     Armstrong also, by its own acts or omissions, caused, contributed to or exacerbated the release of hazardous substances at the facility within the meaning of ORS 465.255(1)(d).

66.     Such releases, threatened releases or disposal of hazardous substances at or from the Site have caused and will continue to cause Kaiser to incur remedial action costs within the meaning of ORS 465.200(23).

67.     The remedial action costs Kaiser has incurred and will continue to incur are attributable to or associated with the Site.

68.     Pursuant to ORS 465.255, Armstrong is strictly liable to Kaiser for remedial action costs attributed to or associated with releases, threatened releases and/or disposal of hazardous substances at or from the Site.

## FOURTH CLAIM FOR RELIEF

### (Contribution:  ORS 465.257)

69.     Kaiser realleges and incorporates by reference the allegations in paragraphs 1 through 69 of this Complaint, as if fully set forth herein.

70.     Releases, threatened releases and/or disposal of hazardous substances at or from the Site caused Kaiser to incur remedial action costs attributed to or associated with the Site.

71.     The DEQ has alleged that Kaiser is liable or potentially liable under ORS 465.255 for remedial action costs attributed to or associated with releases, threatened releases and/or disposal of hazardous substances at or from the Site.

72.     Armstrong is liable or potentially liable under ORS 465.255, and the DEQ also has alleged that Armstrong is liable or potentially liable under ORS 465.255, for remedial action costs attributed to or associated with releases, threatened releases and/or disposal of hazardous substances at or from the Site.

73.     Pursuant to ORS 465.257, Kaiser is entitled to contribution from Armstrong for Armstrong's equitable share of remedial action costs that Kaiser has incurred or will incur as the result of the release, threatened release and/or disposal of hazardous substances at and from the Site.

## FIFTH CLAIM FOR RELIEF

### (CERCLA Declaratory Judgment:  42 U.S.C. §9613(g)(2))

74.     Kaiser realleges and incorporates by reference the allegations in paragraphs 1 through 74 of this Complaint, as if fully set forth herein.

75.     Kaiser may incur additional necessary response costs, consistent with the National Contingency Plan, in responding to the release, threatened release and/or disposal of hazardous substances at and/or from the Site.

76.     Armstrong is liable for some or all of the response costs to be incurred in responding to the releases, threatened releases and/or disposal of hazardous substances at the Site.

77.     A present and justiciable controversy has arisen between Kaiser and Armstrong relating to liability for response costs necessary to address past and future costs necessary to respond to releases, threatened releases and/or disposal of hazardous substances at the Site.

78.     Declaratory relief from this Court as to Armstrong's continuing liability for such response costs to be incurred in the future will prevent any future disputes that may arise as to these future response costs.

79.     Pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201, Kaiser is entitled to a declaratory judgment that Armstrong is a liable party and must contribute its equitable share of future response costs at the Site, including without limitation its share of the DEQ's claim against Kaiser, or any resolution thereof, in the Bankruptcy Case.

## SIXTH CLAIM FOR RELIEF

### (Oregon Declaratory Judgment:  ORS 28.020)

80.     Kaiser realleges and incorporates by reference the allegations in paragraphs 1 through 80 of this Complaint, as if fully set forth herein.

81.     Kaiser may incur additional necessary response costs, consistent with the National Contingency Plan, in responding to the release, threatened release and/or disposal of hazardous substances at and/or from the Site.

82.     Armstrong is liable for some or all of the response costs to be incurred in responding to the releases, threatened releases and/or disposal of hazardous substances at the Site.

83.     A present and justiciable controversy has arisen between Kaiser and Armstrong relating to liability for response costs necessary to address past and future costs necessary to respond to releases, threatened releases and/or disposal of hazardous substances at the Site.

84.     Declaratory relief from this Court as to Armstrong's continuing liability for such response costs to be incurred in the future will prevent any future disputes that may arise as to these future response costs.

85.     Pursuant to ORS 28.020, Kaiser is entitled to a declaratory judgment that Armstrong is a liable party and must contribute its equitable share of future response costs at the Site, including without limitation its share of the DEQ's claim against Kaiser, or any resolution thereof, in the Bankruptcy Case.

WHEREFORE, Kaiser prays for relief and requests that the Court enter judgment as follows:

1.     On its First Claim for Relief, for money damages in an amount to be proven at trial;

2.     On its Second Claim for Relief, for money damages in an amount to be proven at trial.

3.     On its Third Claim for Relief, for money damages in an amount to be proven at trial.

4.     On its Fourth Claim for Relief, for money damages in an amount to be proven at trial.

5.      On its Fifth Claim for Relief, for a declaration by the Court that Armstrong is liable and must contribute its equitable share of past and future response costs at the Site.

6.      On its Sixth Claim for Relief, for a declaration by the Court that Armstrong is liable and must contribute its equitable share of past and future response costs at the Site.

7.      For its reasonable costs and attorney fees incurred herein; and

8.      For such other relief as the Court deems just and proper.

DATED:  November 26, 2018

Respectfully submitted,


/s/ John R. Miller, Jr.
C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina  28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:   rrayburn@rcdlaw.net
              jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone: (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
              dbprieto@jonesday.com

-and-

C. Marie Eckert, OSB No. 883490
Seth Row, OSB No. 021845
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Phone: (503) 224.5858
Facsimile:  (503) 224.0155
E-mail:   marie.eckert@millernash.com
              seth.row@millernash.com

Attorneys for Plaintiff Kaiser Gypsum Company,
Inc.

-19-

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 27, 2018, the foregoing DEFENDANT ARMSTRONG WORLD INDUSTRIES, INC.'S MOTION TO WITHDRAW THE REFERENCE, was filed electronically through CM/ECF and was, therefore, served electronically on those persons registered for notice, including the following:

C. Richard Rayburn, Jr., Esquire
John R. Miller, Jr., Esquire
Rayburn Cooper & Durham, P.A.
1200 Carillon
227 West Trade Street
Charlotte, NC  28202

Gregory M. Gordon, Esquire
Dan B. Prieto, Esquire
Jones Day
2727 N. Harwood Street
Dallas, TX  75201

C. Marie Eckert, Esquire
Seth H. Row, Esquire
Miller Nash Graham & Dunn LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, OR  97201

/s/ *Christopher M. Towery*
Christopher M. Towery (N.C.S.B. # 48235)

Dated: December 27, 2018